Please be seated. Will you call the next case, please? 310-264-310-476, the state of William Schubert, et al., announced by James A. McFedrin v. Stephen C. Donini, et al., and approved by Amy Randolph-Colwell. Commissioner McFedrin. Your Honor. Please record. Good afternoon. Counsel. For the record, I think that the client's bar officer in open court, as our Mr. Mr. Here this afternoon, James McFedrin, for the record. I'm from McQueen Associates here on behalf of Geraldine Schrock, Nancy Lucas, the mom and sister of the decedent, as well as the Citizens Bank, as the Ministry of the State of Robert Schubert. Since in connection with these matters, concerning which the court, for appellate purposes, has consolidated the appeals at this point in time, I will address both of them, both appeals in connection with my argument in reference to the bank account, which is the subject of the second filed appeal. Of course, certain issues in reference to the evidence in connection with that bank account were also admitted into evidence. It's an overall objection at the trial court level in connection with the will contest. So there is a certain overlap in connection with that issue. And depending on the court's ruling in reference to the bank account, in this case, it also could compound the error in reference to what the trial court did, which we felt the, there was a, going back to some of the facts, you're familiar with them, you've read the briefs. I don't want to belabor things, but just a couple of points in summary. Bill Schubert, we've talked about who his family is. Mr. Donini was a friend. In reference to the family, in this situation, as we've indicated, we're here on behalf of a mom and a brother and a sister. Now, 05, Bill Schubert, August of 05, let's say, early 05, he's a healthy, strapping farmer, a significant amount of farmland. Diagnosed with cancer September of 05. There's a bank account change made in September of 05. But at that point, no one is suggesting that he didn't have testimony capacity, whether he put the bank account in someone else's name for convenience purposes, to assist in connection with management. He stayed after he passed away. Whatever the reason was, that's, in any event, there wasn't testimony capacity issues at that point in time. The cancer begins to take over. It goes through chemo in the fall of 05, chemo in 06, into July. He's on substantial heavy duty narcotic medications. These medications, we respectfully suggest, take away his judgment and his meaningful spirit. There's another- Do we have a doctor stating that? Yes, two of them. We had an expert, Dr. Coe, who specifically testified and addressed that point. And I suggest that the most appropriate reading of Dr. Rucol, the central treating physician, was that he wasn't totally rational at that point in time either, in the sense that he wouldn't accept the reality that he was dying. Didn't they say might? Pardon? Did they say definitively that he did have a mental problem? Well, wait, I think there's, we had a trouble here. Just, you're having- I'm having trouble hearing, Judge. Oh, okay. Mr. Kumba, or excuse me, I'm sorry, go ahead. All right. Well, first of all, I don't know if, because actually, Mr. McFedrin, I'm having a little trouble. Of course, I'm just about 10, 9 feet, but I'm having, I'm actually having trouble hearing you. So I'm just wondering if it's, if it's possible for you to speak up loud enough for- I'll try to speak up. Sometimes I get accused of yelling too loud, but I'll speak up. I think I'd speak right into hearing maybe a little more. Is that a mic? Will that help? And if you were to- It's recording mics, I think. So it won't broadcast a little more? No, it doesn't broadcast. Do you want to- I've been here many times. I've never had that issue before. You don't care? Yeah, that's fine. If you can get over there where you can hear better, that's fine. Well, you're getting soft-spoken in here. That's the first time I've ever received that accolade. Okay, all right. And that's the manner in which I'll take it at this point, too. Okay. I'm sorry. I think there was a question. It was either pending or started by Justice McDade. Right, and I've forgotten what it was now. I'm sure you probably- One more second. I'm sorry. Do we need another chair? Go ahead. If you want to pull a chair over or something, go ahead and do it while we're done. How about you, okay? Yeah, I'm fine. Okay, all right. I'm not intending to do anything that's going to need to be available. All right. I just want to make sure everybody's comfy. All right. All right. All right. I'm sorry. Go ahead. It'll come to me later, Mr. McFedrin. Just go ahead, and I'll catch up if I remember what it was I was asking you. Okay. I believe that we were talking about that there was evidence of impaired mental capacity of the deceased, Mr. Schubert. And I was alluding to that from a factual standpoint because I believe there is confident evidence in the record from our retained expert, Dr. Koh, on that subject. There's also lay testimony on that subject. And when I get to people in his life, I don't think we can leave out Mary Lewis. They like to impugn her, and, yes, she might have, years and years ago, might have had some issue with something she was charged at with this hospital. But the important thing is Bill Schubert, the decedent, thought a lot of her. He thought so much of her. He lived with her as his significant other for 10 years, including up to the time of death. She took care of him, was the central one that took care of him up to that time of death. And in connection with this situation, she had probably, and she had really, yes, she knows my clients, but she knows Mr. Dineen, too. And, yes, he threw her off the property after, so that probably didn't endear him to her. But she also cared the most for the one whose estate we're here on, and that's Mr. Bill Schubert. And she said she saw firsthand the debilitation in this man as the months went on, and that when we got to June and July, and this will was done July 28th, a mere five weeks before he was passed away, and in August he was hospitalized for basically, with no one to dispute, it was the beginning of August, and we announced the 11th for confusion. She says in July he was out of it. He no longer had the will. He no longer had the intent. He would walk around the farm outside naked. He would not know, remember how to get out to certain aspects in reference to his fields. So there is significant evidence in this case of these things. But some of the, and that goes to the point that I believe that if some of the, we have an argument in reference to NOV, I'm mindful of the standard on that. But aside from that, I believe that some of the errors in the trial court are so egregious from a legal standpoint that were those errors not committed, that given the substantial evidence we've got in this record, that the scale would be tipped, it would have gone our way. And that's why we suggest at a minimum we should be entitled to a new trial. One of them is in connection with this deceit he had in mind. There are some issues in the record as to his relationship with his sister. He had, but there's evidence that he had a good relationship. There's some that he didn't. But with mine, the overwhelming evidence was that he had a good loving relationship with her, and yet this state, this very substantial estate leaves her nothing. I can't believe the man that he would do that. And then there's evidence from Terry Mitchell, who they cast this person on, who said that he had a great relationship with her and wanted to even do estate planning with her. But I think some of the things that tipped the scales were that mom's cut out of the will, but the needy testified at the time of trial that she got a $50,000 life insurance policy, which was false. It wasn't known it was false at the time. My client knew she hadn't gotten it. She thought maybe it was going to be distributed. Heck, most of this estate's supposed to be still being held. It wasn't known that it was false, but it was paid false testimony that he says after trial, when we said, where's the $50,000? And his lawyer responded, well, it was a mistake. There really wasn't one. Now, the trial court struck that testimony as irrelevant because it didn't go to the will. But in its even striking it, it compounded the error innocently in suggesting, in connection with that, that the jury should disregard the disposition of the $50,000 life insurance to the mother. Well, that restates that she got $50,000. When she never got it, it doesn't exist. For him to say it's a mistake, I suggest, is incredulous and not believable. It was a calculated statement that was tapped him out for creating fraud on the court in the trial court process. They said, well, you should have made a motion for it. We didn't know it was false at that time. When we investigated later, they tell us it don't exist. Then we raise the question and we say, yes, in all of our post-trial motions, we said it came into the process. And the trial court wasn't. Let me just ask you, what was the total value of this estate as best you can tell? Several million dollars. Okay. With respect to a $7 million estate, $50,000 is a pretty negligible, insignificant sum, isn't it? I don't think to most jurors in Bureau County, $50,000 would be an insignificant sum. At least to give some indication that mom was considered in the estate plan of a reasonably significant amount. And I think that the point is, it's still a patent falsehood that was allowed, that was testified to. And I think in itself, that creates a basis for error. But then when you take that, and it's not just a single error, but the compounding of the multiple ones in connection with allowing the information on the bank account, that as of the trial, the will contest, it hasn't been determined who's rightfully entitled to it. And yet he's liable to put into evidence through the banker, which we've got Dead Man's Act issues and things of that nature, he thought he'd put into evidence that in September of 05, that he put it there, leaving into Mr. Danini's name as a POD, and leaving the inference that this is part of his overall plan to leave Danini the entire estate. Well, after the decedent died, within three days, Mr. Danini and Mr. Conner go to the bank. They don't take the account for himself, which is if it would end. And Danini knew about the account before. He says he tries to stay under oath in the bank account thing. And this, again, relates to the will contest, because it gives the indicia if he's going to leave him a $500,000 account, then maybe he's going to leave him the whole estate. And the jury's mine in the will contest. But three days after death, he doesn't go in and take the account for himself, even though he knew that there was a college citizen's bank for him, supposedly, even though his later pleading says that, and even though there's no other accounts at the citizen's bank. He puts that account in the name of the estate. And he uses it as an estate asset to pay bills, which is probably what the decedent intended to be used for, is to be put into the estate and be used to pay bills for two years almost. He doesn't file anything to try and get the money for himself until February of 08. And in connection with that pleading, he also acknowledges that he knew about this account back in 05. Well, if you knew about it in 05, why, if it was intended to be yours when he died in 06 and not the estate, did you put it into the estate's name? And he had his attorney with him when he went to the bank to do it. They're trying to blame the poor banker. She didn't tell us it was in our name. Well, then he already knew. Besides, if it's a $500,000 estate, don't you think they'd check for the registration? They knew, regardless of the registration, it was intended to be part of the estate asset. And yet, in the will contest, the jury was allowed to have the inappropriate interest, and $500,000 is not an insignificant sum, that this is part of his overall plan. This is part of his overall plan. And that bank account should be back in the estate as an estate asset. And all their cases that they cite on the bank account stuff start from the premise of the re-registration and POD to him and ignore the actual facts in the case, which are that he re-registered that account into the estate's name, co-mingled it. He either trampled his duty as a fiduciary by using it as a co-mingling estate with personal money, or he did what was supposed to be done in the first place, put it into the estate's name, used it as an estate asset, but then he's not entitled to get it back. And the jury in the will contest shouldn't be allowed to have the inappropriate inference that it was part of the overall plan, that he gets everything. What did the account say it was? Didn't it say it was payable on death to Mr. Dunaney? Not after he registered in the name of the estate of his own free will. That's the whole premise that they keep forgetting. They go back to the old five registration, or the old five registration was re-registered POD to him, which he knew about. They refuse to acknowledge that at the time he filed his petition to get that money back, that's an estate account. He's the one that's supposed to have the burden of proof to get it back. You're arguing that that's probably what Mr. Schubert intended was for it to be used to pay estate fees, but there's no indication that that's what he intended. As evidenced by the fact that by Mr. Dunaney's conduct, the only evidence in the record that he took before February of 08 is that Dunaney knew it was to be for that reason, and that's the way he did it. Otherwise, you don't put it into the estate's name when you know about the account. So there is evidence, circumstantial evidence, and the only evidence in the record. By Dunaney himself, they respectfully suggest we cannot lose sight of the fact that he re-registered this account into the estate's name with the benefit of counsel, of his own free will, used it as an estate asset for two years, and he had talked with supposedly Schubert about this account. The only reasonable inference is that if he did talk to him about it, then he knew it was supposed to be used as an estate asset to pay bills. I'm confused. I thought the evidence was that he knew there was an account with his name on it, that he did not know any of the details about the account, and he didn't ask any questions after he was told there was an account. So there was the evidence that he knew that there was an account payable on debt? Yes, one of my pleadings that shows exactly what he knew in his pleading. Okay. First, he knew there was an account at the Citizens Bank. These are the only ones there. That wasn't supposed to be an account there for him. So to say that he didn't know any of the details, if you go to the Citizens Bank and the only account they've got there is $500,000 and you know there's supposed to be one there in your name at that bank for that amount of money, should be end of story. It should be mine if that was your intention. That's a subterfuge, Judge. Excuse me a second. May I get the e-mail? We have two minutes. Okay. That on September 16, 2005, informed by William Schubert that, among other things, there was an existence at an account at Citizens Bank with my name on it. He never mentioned the account again, and I never inquired any further. This is the only account there. So he knew about this account. To suggest he didn't know details is a subterfuge and another excuse. Wasn't that a question of fact? Whether it was a subterfuge and excuse? Isn't that a question of fact? It should have been in evidence in the will contest. It hadn't been decided yet. Okay? And that's part of our issue with that. And it was decided later. But the trial court even acknowledged he had the burden of proof. How do you overcome that burden of proof at trial when that's the evidence? And I'll get up in my rebuttal. The trial court misconstrued saying the only way that it could not be his if he intended to make a gifted state. He forgets the point that it could have been for convenience, which many of them are. The trial court never considered that. Just like the trial court never even considered on the $50,000 what was actually said at trial. He couldn't remember. Even though he had attached it. I respectfully suggest that these errors and others in reference to some hearsay points combined to provide, we reaffirm all of our contentions in reference to NOV, especially those in reference to each of these errors in the visiting, but certainly the combination of them providing a basis for our client to have a trial in this case. Thank you, Mr. McFeather. Thank you, Your Honor. And by the way, out of fairness, you can sit where you'd like. If, during Mr. Como's argument, if you want to, if you have any trouble hearing, feel free to move over there. If I can hear, I'm fine. Okay. Mr. Como? Thank you. Thank you, Your Honor. Judges of the court, Mr. McFeather, I'm attorney A. Randolph Comba. I represent the appellee, Stephen Donini. This has been two things joined into one, a will contest and a question over some monies in the estate. That, first of all, to clear up the question of the $50,000 insurance testimony, that there is, it's unquestioned that Mrs. Schrock received an annuity from her son for $5,352. So she, in fact, did receive something. That at page four and page seven of the appellant's reply brief, he indicates that the falsehood, the alleged falsehood was not known at the time of trial. I differ with that. The testimony as to the alleged $50,000 was on 5-4, May 14, 2009, and it's found in RP-10. The clerk's docket entries show for 5-14-09 and for 5-15-09 that Mrs. Schrock was present. In other words, it was a two-day situation. She had ample time to talk to her attorney about this question between the adjournment on the 14th and the next day on the 15th. The record is devoid of any questions by the attorney, the trial attorney for Mrs. Schrock, asking the trial attorney for Mr. Donini. Therefore, I beg to differ with Mr. McFedrin that I think that there was that they had an opportunity to ask and that they did not ask. They did not raise the question. That I, as Mr. Donini's attorney, I would point out to the court that the term falsehood and the derivatives of the term falsehood were used 36 times in Mr. or Mrs. Schrock's brief and reply brief. Going forward a little bit, that the plaintiffs have made a big issue of this mat and they've alleged and branded in writing a falsehood. On page 22 of plaintiff's brief, it states that the medical doctors, including Dr. Patel, their witness, saw the decedent in July of 2006. Dr. Patel, in his testimony, stated that he saw the decedent from September of 2005 and the next time was August 7, 2006. Now, I, in my draftsmanship of my brief, pointed out using the term one-time mistake. I didn't sensationalize or anything like that or make any allegations. There was no testimony to corroborate that one way or the other. Excuse me, there was no testimony to corroborate. He didn't get into a question of testimony in drafting an appellate brief. But it's my main thing that they did make a mistake and that I treated it as a mistake. That a mistake was made by Mr. Donini because of, for whatever reason, and that the reason in part was possibly due to the fact that she had received an annuity. And they called it 36 times falsehood or some derivative of falsehood. That the, as to the witnesses, the testamentary capacity, I think Dr. Vukov, the cancer doctor, testified that he was, that he, he, the decedent told he, the doctor, that his, that the lessening of the drug was on him. The less dosage, the smaller dosage helped his, he was much clearer. There was that, that was in Dr. Vukov's testimony that, that the decedent told him that at or about the time the will was executed. That Attorney Boland testified that, in fact, he was one of the witnesses to the will. He testified that he knew the decedent for several years and as a client prior to this and independently of this, and that he was, that the client, the decedent, when he came in for the will, totally knew what he was talking about. He told him that he, the decedent told Mr. Boland that he was a close friend of Mr. Dineen's and that he told him that he, he, the decedent told Boland that there was a rift between he and his sister. I think the court should be aware of that. The one that is outstanding and coincidental that on the day after the will was executed, July 29th, a Richard Webster, who was a machine, arm machine repairer, went out to check the bailer at the request of the decedent. And that, that was, he describes in his testimony very clearly that the, the, there was, that Mr. Schubert, the decedent, knew what he was doing, operating, he operated the machine. He, he described what the problem was to Mr. Webster and Mr. Webster remembered that. It was the day after the will was executed. There are friends and acquaintances and neighbors that are mentioned in the brief as to that. Moving to the second page or second part of the, of the situation, the, the question of the $586,000 that, as the question is, what happened immediately upon death? Immediately upon death under the statute became Mr. Denise. The record is clear from that. Mrs. Fry did not communicate to Mr. Nene. That account at that time was a payable upon death account and it was his money. I think that that that speaks for itself, that the two legal points there that I would point out. One is the payable bond death. And the second is that it did not meet the transfer. And the judge is absolutely proud. Judge is absolutely correct. The transfer did not meet the criteria of a gift. The. Interestingly enough, in that particular situation, the judge's decision, the special administrator appointed by Judge Hollerick. Agreed with Judge Hollerick that the funds should be turned over to Mr. One other thing I would, I would point out to the court. So you can have a complete picture of his mental state. Is that his being Mr. Knee or excuse me, Mr. Schubert's the decedents that there was some. Argument by Mr. McFedrin as to the fact that Mr. The knee or excuse me, Mr. Schubert, the decedent was walking around disoriented on August the 7th. There's absolutely no question about that, that he was suffering from ammonia. Black and ammonia in some manner, which is consistent with pancreatic cancer. The point I'm suggesting to you is that there's testimony of his mother and his, his friend, his girlfriend. That the three of them in mid August of 2006, Mr. Schubert.  They, the two women on testimony stated that he, Mr. Schubert went to test, went to purchase furniture with them. And the three of them ate lunch at the cherry, cherry being a town in Illinois, cherry supper club. So that Mr. McFedrin is right to a point, but not completely right. That what to clarify this a little better is that after this is delusions in August 7th, that he was again. Fine after the medicine was given to him. That. I have in my brief, I have talked about what I think in the five areas of the law, the dead man's act, hearsay, parole evidence, the gift and payable fund death. The only comment I will make on any of them, because I think I covered them in the brief, citing the statutes and discussing case law on each. That the parole in in sequence that. The. Plaintiff in their brief spelled parole p a r o l e, which throws off the meaning of it. As something rather than describing a piece of evidence, describes something with the Department of Corrections. I spelled it correctly in my report or in my brief and in the reply brief, they still continued to spell it p a r o l e. I. Would anything else I would stand up because of time because I think I've covered it. I would stand on my brief. I would ask the court to sustain the trial court and his decision. If you have any questions, I'll be happy to answer that. No, no question. Thank you very much. Mr. Common. Mr. McFedrin. Some are both. Thank you. Honor. Court. Counsel. We're back towards the beginning of his argument. Well, I wasn't there at the trial on the 14th and 15th of May with Mr. Raccoon. You're there. I expect that the reason he didn't question Mr. Combs. He took his witness. The court had ruled it wasn't getting any evidence, but he still took his witnesses. Telling the truth that there was a $50,000 policy and that we'd just get it later. That's why we wrote a letter after trial. So there was no reason at that point to expect that the testimony was false. None of the estate had been distributed or most of it had not. So the fact that she hadn't got it didn't mean she might not get it if it was there. So we respect. We didn't know it was false then and that's why it was raised as a falsehood later. And if we mentioned it 36 times, I'm not. And a few more here today with all due respect. That's because we do respectfully suggest it's significant and do take issue with counsel on that subject on their point on the doctors in our brief suggesting whether they had seen him all in August. I know that. And I know Mary Lewis and Vukov saw him in August. Patel might have seen him in July. Patel may have not seen him until August. But I think he testified in reference to that. And if we should have left him, I'll find. No, it's not the same as saying somebody got $50,000. Let me let me ask you. I'm going to talk about that. I'm sorry. Let me ask you about something here. With respect to the cash money. Okay. You agree that it was a payable on death policy. So therefore, legally, upon Mr. Schubert's expiration, it automatically became Mr. Danny's money. It's a matter of it just happens magically, right? Not with all due respect, Your Honor. Not necessarily. I agree that the words say that. But if that's not the decedent's intention is X as evidenced by the actions of the person who got it, who knew about the town earlier, then. And then. And how about. Well, this gets me to my question. So let me just. So are you arguing it was never Mr. Danini's money or that it was his money and he donated it to the estate? I'm arguing. He gifted it to the estate. I'm arguing a combination of both and the alternative. And that he had the burden of proof to demonstrate getting the money back, which the trial court agreed he did and didn't need it. Because there's no evidence there that it was necessarily intended to be his. Especially given what he had done as far as using it as estate money to overcome that. And that's what, when we talk about that material evidence, we may have put an E on the word, but I suggest we've interpreted the concept correctly in reference to the cases. They, in their argument, Danini continues to not recognize the fact that how about how the accounts registered that he set up a contract with the bank after death. That's the estate's account. Can we all agree that that. Well, let me. Okay. We'll just go on from here for a second. Just assume that the law is, for the sake of this question, the law is that if it's a payable on death policy on Mr. Schubert's death, this was Mr. Danini's money. Now let's, and assuming that was true, why in the world would Mr. Danini make a gift to Mr. Schubert's estate of half a million dollars? Because he knew it wasn't intended to be his money. He knew it was intended to be kept for the estate, to be used for operating capital, the same as Schubert had done for his lifetime. He assisted him in the farming. So I think that, I think that that's why that would be done. It was set up that way from a convenience standpoint, or perhaps. But the bottom line is, we are entitled to talk about how, how the contract with the bank was set up. How does Danini get around the fact that he set an account and used it as an estate asset for two years? Why does he get to take it back? That's the contract that was operable that he set up himself. That's a binding admission. It should be a binding admission on him. And we've argued that extensively in this case. I guess I'm out of time. Although, these were consolidated appeals, I think you might have given, Well, Mr. McFedrin, thank you. Mr. Kamba, thank you both for your arguments here today. It's all done, right? And this matter will be taken under advisement. Written disposition will be issued. And right now, this court will be in recess  Thank you, Your Honor.